Case 3:23-cv-00193-GMG   Document 27-2   Filed 10/25/24   Page 1 of 8  PageID #: 107

DALE BERNARD BEARD, JR., v.                                    TROOPER DANIEL E. SMITH
DANIEL E. SMITH, et al.                                              August 29, 2024

```
 1            IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 2                      AT MARTINSBURG

 3
    * * * * * * * * * * * * * * * * * * * * *
 4
    DALE BERNARD BEARD, JR.,
 5
                Plaintiff,
 6

 7   v.                      CIVIL ACTION NO. 3:23-CV-193
                             Honorable Gina Groh
 8

 9   DANIEL E. SMITH, Individually, and
     ADAM ALBAUGH, Individually,
10
                Defendants.
11
    * * * * * * * * * * * * * * * * * * * * *
12

13

14

15        Deposition of TROOPER DANIEL E. SMITH, a
    Defendant herein, taken on behalf of the Plaintiff,
16   in the above-entitled action, pursuant to Notice,
    before Sheryl L. Gasparik, Registered Professional
17   Reporter, and Notary Public within and for the State
    of West Virginia, held at the law firm of Pullin,
18   Fowler, Flanagan, Brown & Poe, PLLC, 261 Aikens Center,
    Suite 301, Martinsburg, West Virginia 25404, on the
19   29th day of August, 2024, commencing at 1:46 p.m.

20

21

22            REALTIME REPORTERS, LLC
                  713 Lee Street
23             Charleston, WV  25301
                  (304) 344-8463
24              realtimereporters.net
```

Exhibit B

1  mean?  In what way was Mr. Beard coming off to you as
2  confrontational?
3      A.  I could just tell.  He was obviously upset
4  or annoyed that I had stopped him.  You know, when I
5  explained that to him that he didn't have an inspection
6  sticker, he was like, "Yeah, obviously, listen to my
7  car," you know, saying he had a mechanical issue with
8  his vehicle.  You know, there was exhaust, having some
9  problems.
10     And then, you know, immediately, when I asked for
11 his driver's license and registration, he just tells
12 me, "Well, no, just run it, you can get it that way,
13 I don't think it's in here," kind of thing.  That's
14 more abnormal than a typical individual who I would
15 ask for their, you know, information to give me.
16     Q.  And at some point, did you ask him if he had
17 any weapons in the vehicle or anything illegal in the
18 vehicle during the course?
19     A.  I do believe I asked him if there was anything
20 illegal inside the vehicle, yes.
21     Q.  And what was his response to that?
22     A.  He said, "No, do you have anything illegal
23 on you," I believe.
24     Q.  And that exchange occurred prior to you

Case 3:23-cv-00193-GMG   Document 27-2   Filed 10/25/24   Page 3 of 8  PageID #: 109

DALE BERNARD BEARD, JR., v.                                TROOPER DANIEL E. SMITH
DANIEL E. SMITH, et al.                                    August 29, 2024

1  other than not having an inspection sticker?
2      A.  Prior to me ordering him out of the car, no.
3      Q.  At any point, did you develop any concerns
4  about your safety in interacting with Mr. Beard?
5      A.  Yes, sir.
6      Q.  And tell me about that.  At what point was
7  that?
8      A.  Pretty much exactly what I just stated.  I
9  couldn't see where his hands were feeling around in
10 the glove box.  He was already nervous, you know, what
11 I interpreted to be nervous behavior.  You know, it's
12 not uncommon for a police officer to get shot from the
13 driver's side window.  So I guess you could say that
14 that's what heightened my suspicion.  So if I can see
15 where his hands are, then I -- you know, I am able to
16 lower that, I guess, concern.
17     Q.  It was daylight, correct?
18     A.  Yes, sir.
19     Q.  And you didn't have anything blocking your
20 vision of Mr. Beard during this interaction?
21     A.  Yeah, with his physical body, like his center
22 mass, no, but his hands, when they are feeling around
23 in a small vehicle, and I am a pretty tall individual,
24 you know, squatting down to get into the door of a

```
 1       Q.   The dog handler arrived and commenced to run
 2   the dog around the car, right?
 3       A.   Correct.
 4       Q.   What was the outcome of that?
 5       A.   Deputy Kolb advised that it was a positive
 6   alert.  The dog gave a positive alert for an odor of
 7   narcotics in the vehicle which gave us probable cause
 8   to search the car.
 9       Q.   And then you searched the car?
10       A.   Yes, sir.
11       Q.   And the basis for performing that search was
12   the alert by the dog?
13       A.   Yes, sir, the alert is what gave us the
14   probable cause to search the car.
15       Q.   And tell me about the search of the car.
16       A.   Myself and another officer on scene assisted
17   in searching the car.  What specific parts of the search
18   did you -- are you inquiring about, sir?
19       Q.   What did you find in the car?
20       A.   We found a backpack full of prescription pill
21   bottles, some with prescription or, I guess, labels on
22   them, others with no labels, one in particular with a
23   large amount of white powder which had no label on it.
24   We found some what I believed to be some marijuana THC
```

```
 1  wax, open containers of alcohol or old beer cans.
 2      Q.  Did you personally search the backpack?
 3      A.  I don't recall.  I would need to pull up
 4  my body camera.  I know I assisted in searching the
 5  vehicle.  I just don't remember specifically if I was
 6  the one that went through the backpack.
 7      Q.  Would it be fair to say that the inside of
 8  that vehicle was pretty messy?
 9      A.  Yes, I would agree with that.
10      Q.  And it had a wide assortment of things,
11  everything from like concrete, bags of concrete or
12  Sakrete, and like some hay for animal feed.  Do you
13  recall that?
14      A.  I don't recall any hay, just the beer cans,
15  and, you know, it was dirty and stuff like that.
16      Q.  Did it appear to you that the inside of that
17  car was consistent with Mr. Beard's claim that he was
18  using it as like a farm vehicle?
19      A.  Potentially, yes.
20      Q.  You don't have any recollection of searching
21  the backpack?
22      A.  I really would have to yield to it to my body
23  camera.  I can't tell you off -- right off the back of
24  my head if I went through it.
```

```
 1        A.  I don't -- I don't recall.  I don't believe
 2   so but I don't recall.  I would have to -- I have worked
 3   a lot of drug cases, so I would have to go back and
 4   review all those case submission forms, sir.
 5        Q.  Do you recall whether you asked the prosecutor
 6   for a letter to test the alleged marijuana tar in this
 7   case?
 8        A.  I don't, no, sir.
 9        Q.  Would it be fair to assume that you did not
10   ask --
11        A.  Yes, sir --
12        Q.  -- the prosecutor?
13        A.  -- I would say that's fair.
14        Q.  Was the Task Force that did the field testing
15   for you, were they not able to field test the marijuana?
16        A.  I don't -- I am not sure, sir.  I didn't ask
17   them to field test the marijuana, to my recollection.
18        Q.  Did they?
19        A.  I don't recall.  I don't believe so.
20        Q.  You wrote in your report that "the results
21   came back inconclusive but did indicate to me that it
22   tested negative for a fake narcotic substance."  What
23   does that mean?
24        A.   Pretty much, to my recollection, the Task
```

```
 1  Force officers, when they came and tested it with
 2  his laser, they instructed me that it came back as
 3  inconclusive but that it didn't come back as a fake
 4  substance or a substitute such as, you know, baking
 5  soda or an imitation substance that drug dealers will
 6  cut their product with.
 7       Q.  So the field testing did not indicate that
 8  it was -- may have been a substance used to imitate
 9  or cut narcotics --
10       A.  Yes.
11       Q.  -- is that right?
12       A.  Yes, sir.
13       Q.  Do you know what the substance was?
14       A.  I don't.  I had what I believed it to be, and
15  that's why we sent it down to the state police lab.
16       Q.  And you charged Mr. Beard with possession with
17  intent to deliver cocaine?
18       A.  Yes, sir, I did.
19       Q.  What evidence did you believe existed that
20  there was any intention by Mr. Beard to deliver cocaine
21  to anybody?
22       A.  Looking at the quantity in the backpack full
23  of various prescription pill bottles, some with labels
24  on it, some without, you know, based on my training
```

```
 1  state police lab, it was field tested by these Task
 2  Force guys at the police station and they confirmed
 3  at that time that it was not cocaine; right?
 4       A.  No, sir.
 5       MR. GAMBLE:  Object to the form.
 6       A.  Yeah, they didn't confirm that it wasn't
 7  cocaine.  Like I said, I don't know how their machine
 8  works, sir, I don't.  I went with what they told me.
 9  They said that it could absolutely still be -- be a
10  narcotic of cocaine.  It's just their machine doesn't --
11  I really can't answer that question without knowing
12  exactly how that machine operates.
13       Q.  But you wrote in your report, "Their results
14  came back inconclusive."  Is that right?
15       A.  Yes.
16       Q.  And that would be inconclusive for confirming
17  that it was cocaine?
18       MR. GAMBLE:  Object to the form.
19       A.  Um...
20  BY MR. BRYAN:
21       Q.  Well -- all right.  Inconclusive, what does
22  "inconclusive" mean?  You wrote it.
23       A.  Inconclusive is that they don't know what
24  type of substance it is, that the machine, it did not
```