Case 3:23-cv-00193-GMG     Document 27-3     Filed 10/25/24     Page 1 of 7  PageID #: 115

DALE BERNARD BEARD, JR. v.                                    BERNARD DALE BEARD, JR.
DANIEL E. SMITH, et al.                                       August 29, 2024

```
 1           IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 2                     AT MARTINSBURG

 3
     * * * * * * * * * * * * * * * * * * * * *
 4
     DALE BERNARD BEARD, JR.,
 5
                Plaintiff,
 6

 7   v.                          CIVIL ACTION NO. 3:23-CV-193
                                 Honorable Gina Groh
 8

 9   DANIEL E. SMITH, Individually, and
     ADAM ALBAUGH, Individually,
10
                Defendants.
11
     * * * * * * * * * * * * * * * * * * * * *
12

13

14

15       Deposition of BERNARD DALE BEARD, JR., the
     Plaintiff herein, taken on behalf of the Defendants,
16   in the above-entitled action, pursuant to Notice,
     before Sheryl L. Gasparik, Registered Professional
17   Reporter, and Notary Public within and for the State
     of West Virginia, held at the law firm of Pullin,
18   Fowler, Flanagan, Brown & Poe, PLLC, 261 Aikens Center,
     Suite 301, Martinsburg, West Virginia 25404, on the
19   29th day of August, 2024, commencing at 10:12 a.m.

20

21

22              REALTIME REPORTERS, LLC
                   713 Lee Street
23              Charleston, WV  25301
                   (304) 344-8463
24              realtimereporters.net
```

Exhibit C

```
 1   your wife's name?
 2          A.   I don't know.
 3          Q.   Okay.
 4          A.   Yeah, I don't know.
 5          Q.   But, regardless, that vehicle at that time did
 6   not have a valid inspection sticker; is that correct?
 7          A.   It did not.
 8          Q.   Okay.  And I noticed in the video that you
 9   were looking in the vehicle, after you were pulled over,
10   for the registration and insurance.  Did you end up
11   having those with you that day or do you know?
12          A.   I don't know.
13          Q.   Okay.  Let me ask you this, was it properly
14   registered at the time?
15          A.   It was, yeah.
16          Q.   And did it have insurance at the time?
17          A.   It did, yeah.
18          Q.   Okay.  And, again, based on your discovery
19   responses, is it accurate to state that you do not
20   question the legal basis for why you were stopped in
21   your vehicle that day?
22          A.   Correct.
23          Q.   And that's because operation of a vehicle in
24   the state of West Virginia without a inspection sticker
```

```
 1  is illegal?
 2       A.  Correct.
 3       Q.  And without an inspection sticker, your vehicle
 4  should not have been operated on the roadway; is that
 5  fair?
 6       A.  Yes.
 7       Q.  So tell me, if you would -- and, you know,
 8  obviously, I already have seen the video which makes
 9  it a heck of a lot easier to ask these types of
10  questions -- but just kind of walk me through what
11  you recall happening and how you recall it happening
12  from your perspective, like Officer or Patrolman Smith
13  turns on his lights and pulls you over.
14       A.  Okay.  Yeah, so from that moment, I had saw
15  that he -- the lights were on, I was getting pulled
16  over.  I didn't know why at the time, but he got out
17  of the car and come up to the window.  I believe he
18  asked for a license and registration, insurance.  He,
19  immediately, immediately asked me if I -- or said I was
20  nervous, I believe.
21       Q.  Uh-huh.
22       A.  I don't want to put words -- again, the video
23  makes it -- does make it easier.
24       Something around that time, something about me
```

```
 1        Q.   Why do you think he would do that?
 2        A.   I am not sure.
 3        Q.   Okay.  But you would agree with me that
 4   somebody, for example, who doesn't know somebody,
 5   doesn't know their mannerisms, could have observed
 6   things that you may not have perceived.  Would you
 7   agree with that?
 8        A.   I believe that is possible.
 9        Q.   In the video, do you recall Patrolman Smith
10   asking you to step out more than -- more than one time?
11        A.   I don't know if he asked me more than once.
12   I don't recall without watching.
13        Q.   I will submit to you that I recall at least
14   three -- he asked you at least three times or tells you
15   at least three times.
16        A.   Okay.
17        Q.   Any reason to dispute that?  And, again, the
18   video will show --
19        A.   Right.
20        Q.   -- what the video shows.
21        A.   Yeah, what's on the video is what it shows,
22   correct.
23        Q.   Up until Patrolman Smith put hands on your
24   arm, what steps, if any, did you take to get out of
```

```
 1  the vehicle, up until the point of him making contact
 2  with you?
 3       A.  None that I recall.
 4       Q.  Okay.  Why did you not step out of the vehicle?
 5       A.  Because I wasn't sure why he was asking.
 6  You know, I wasn't sure what, you know, predicated
 7  me getting out of the car.
 8       Q.  And based on your response to Patrolman Smith
 9  asking you to get out of the car, your response to
10  him was "had I committed a crime" or "what crime did
11  I commit."  Was it your belief that he could not ask
12  you to get out of the car unless he informed you of
13  what crime or informed you of a crime that you had
14  committed?
15       A.  I'm sorry, ask me again.
16       Q.  Sure, and I jumbled that.
17       A.  That's okay.
18       Q.  Based on your response to his request for
19  you to step out of the car, and what I will submit
20  to you is -- I wrote it down -- I think your response,
21  if I wrote it down correctly, is "did I commit a crime?"
22  I believe you say, "No, did I commit a crime?"  You
23  say you didn't say no --
24       A.  Yeah.
```

```
 1  the West Virginia State Police Drug Lab that it was
 2  determined to be trazodone.
 3       A.   That is correct.
 4       Q.   And I think you say that at some point in the
 5  video that it was trazodone.
 6       A.   I do, yes.
 7       Q.   Was this, was the substance that was in this
 8  bottle that is in Exhibit 2 prescribed to you?
 9       A.   It was.
10       Q.   Okay.  By who?
11       A.   I believe it was Dr. Karen Miller --
12       Q.   Okay.
13       A.   -- but that's my belief.  It's been a while,
14  you know, since I was prescribed the medications.
15       Q.   So this happened, this incident occurred
16  in 2021, August of 2021.  When, to the best of your
17  knowledge, would you have been prescribed trazodone
18  by, as you believe, Dr. Miller?
19       A.   Yeah, it would have been -- again, just a
20  roundabout for me, it would have been late -- maybe
21  mid to late 2000-teens somewhere.  Again, I don't
22  know exactly, but I believe she might have started
23  prescribing it somewhere ... yeah, 2000-teens somewhere.
24       Q.   Is Karen Miller, Dr. Karen Miller, your primary
```

```
 1  weren't -- if you don't like the way trazodone made you
 2  feel, did you take something as an alternative to it at
 3  that time?
 4       A.  Not that I recall.
 5       Q.  Okay.  At the time that you would have received
 6  the trazodone, did you modify the condition of that
 7  medication in any way after you received it?
 8       A.  I did not.
 9       Q.  To the best of your knowledge, how did the
10  trazodone come to be in a powdered form?
11       A.  Because the bag sits out often, a lot of
12  thunderstorms, a lot of rain.  It goes in the back
13  of my truck.  It sits out in the weather.  That would --
14  that would be my explanation.
15       Q.  Okay.  So it would be your position that this
16  medication came to be in the powdered condition that we
17  see here in Exhibit 2 just from being in your backpack
18  and being old, essentially?
19       A.  Correct.
20       Q.  Is that right?
21       A.  Yes.
22       Q.  And just so we are clear, you did not crush
23  this substance up that is in Exhibit 2?  You didn't
24  crush this up into a powder?
```